### THE BUENA VENTURA et al.

#### (District Court, S. D. Florida. May 27, 1898.)

**1. Prize—Right of Capture.**

By the prize law, as accepted at the present time, the war vessels of a belligerent have the right, in the absence of any declaration of exemption by the political power, to capture wherever and whenever found afloat, anything which belongs to or is the property of the enemy. Whenever it is claimed that an exemption is made by proclamation or ordinance, the burden of proof is on the claimant to show that the particular case comes within the exemption; and, although such proclamation or ordinance is to be liberally construed in behalf of the claimants, there must be found therein sufficient language to justify the court in finding that the intention was to exempt from seizure the class of property under investigation.

**2. Same—War with Spain—President's Proclamation—Spanish Vessels in American Ports.**

The declaration in the president's proclamation of April 26, 1898, that, "Spanish merchant vessels in any ports or places within the United States, shall be allowed until May 21, 1898," for loading cargoes and departing, and shall not be subject to seizure on the voyage, applied not only to vessels in such ports at the date of the proclamation, but also to those in American ports at the breaking out of the war on April 21, 1898, and which sailed prior to the proclamation. The cargoes of such vessels are entitled to the same exemption as the vessels themselves.

**3. Same—Vessels Bound for American Ports.**

The fifth article of the president's proclamation of April 26, 1898, declaring that any Spanish merchant vessel which, prior to April 21, 1898, sailed from any foreign port bound to any port of the United States, shall be permitted to enter such port and discharge her cargo, and afterwards depart without molestation, does not exempt from seizure vessels sailing from European ports for Spanish ports in Cuba, to there discharge their cargoes, and which, in the ordinary course, would then come to a port of the United States to receive cargo.

**4. Same—Enemy's Property—Neutrals Having Trading Houses in Enemy's Country—Corporations.**

Vessels or property belonging to a trading house established in an enemy's country is liable to condemnation as prize whatever the domicile of the partners; and this principle applies with even greater force to the property of a corporation formed under the laws of the enemy's country, regardless of the domicile of the individual stockholders, or of any equitable interest neutrals may have therein.

**5. Same—Vessels Seized before Formal Declaration of War.**

The practice of a formal proclamation before recognizing an existing war and capturing enemy's property has fallen into disuse in modern times, and actual hostilities may determine the date of the commencement of

war, though no proclamation may have been issued, no declaration made, and no action of the legislative branch of the government had.

6. SAME—VESSELS BOUND FOR AMERICAN PORTS—LIBERTY TO TOUCH FOR COAL.
A vessel which cleared from an American port for a foreign port prior to the outbreak of hostilities, with liberty, however, to touch at another American port for coal for her voyage, was not a vessel bound for an American port, within the meaning of the president's proclamation of April 26, 1898, and was, therefore, subject to capture.

7. SAME—NEUTRAL CARGO IN ENEMY'S VESSEL.
The exemption declared in section 2 of the president's proclamation in favor of neutral goods, not contraband, found under the enemy's flag, applies to the case of a capture between the outbreak of hostilities and the date of the proclamation.

8. SAME—PRESUMPTIONS—CARGO SHIPPED BY NEUTRALS TO ENEMIES.
Cargo shipped in enemy's vessels by neutrals to parties in the enemy's country is prima facie enemy's property, but this presumption can be overcome by evidence.

9. SAME—CARGO CONSIGNED TO NEUTRALS.
Cargo shipped from this country in an enemy's vessel, and consigned to residents of a neutral country, is presumptively neutral cargo, and not subject to seizure under the president's proclamation.

These were libels filed by the United States to procure the condemnation as prizes of war of the Spanish steamships Buena Ventura, Panama, Catalina, Miguel Jover, Pedro, and Guido, and their cargoes.

J. N. Stripling, U. S. Atty., and Ed. K. Jones, for the United States.

Converse, Kirlin & Patterson, for the Buena Ventura and the Panama.

Wilhelm Mynderse and G. Bourne Patterson, for the Pedro and the Guido.

G. Bourne Patterson and Geo. Deriegre, for the Catalina and the Miguel Jover.

LOCKE, District Judge. The questions involved in these several cases, being of the same character, have been considered together.

Of these vessels, the Buena Ventura cleared from the port of Scranton, Miss., on the 16th of April, 1898, and sailed with a cargo of lumber for Rotterdam the 19th of that month, and was captured in the Straits of Florida, between Key West and Cuba, on the 22d, by the United States steamship Nashville. The Panama cleared and sailed from New York for Havana with an assorted cargo on the 20th of the same month, and was captured on the 25th by the United States steamship Mangrove, while approaching that port. The Catalina and the Miguel Jover, ladened with cotton and staves, cleared from New Orleans on the 21st of the same month, and sailed the evening of the same day for Barcelona and Genoa. The Catalina was captured by the United States steamship Detroit, and the Miguel Jover by the United States steamship Helena, both on the 24th. The Pedro, which had sailed from Antwerp some time before, had been into Havana, had cleared for Santiago, Cuba, and was captured on the 22d of the same month about 12 miles from the port of Havana by the United States steamship New York; and the Guido, from Liverpool, bound for Havana, by the way of Santander, Cuwana, and La Puebla, was captured on the 27th by the United States steamship

Terror. They are all Spanish vessels, sailing under the Spanish flag, with royal patents, officered and manned by Spaniards, and, with the exception of the Pedro and Guido, no question has been raised as to their being enemy's property. They were all merchant vessels, engaged in regular lines of commerce, and this, and the hardship and injustice of the captures before a declaration of war, has been strenuously urged in argument as contrary to the humane policy of our government, in addition to the provisions of the president's proclamation. The principles of the law of prize have been so often and so distinctly declared by the highest courts of all civilized countries that they need no extended review here. The law of prize is a law of war, of might and of force, which is to be exercised at the order and behest of the executive, and not upon the principles of policy or equity; and while prize courts, where questions of doubt arise, yield as far as possible to the claims of humanity and respect for personal rights, yet they cannot be controlled by such considerations. The former rule of the law of prize was that the belligerent had a right to capture the property of the opposing belligerent or antagonist under any circumstances, and to injure him in any way, by depriving him of his property. That was the original practice, but it has been restricted by the gradual advance of civilization until by the prize law of to-day, as accepted, the captor has the right, in the absence of any declaration of exemption by the political power, to capture, wherever and whenever found afloat, anything which belongs to or is the property of the enemy. Whenever it is claimed that there is an exemption made by proclamation or by ordinance, the burden of proof is upon the claimant to show that the particular case comes within the exemption, and, although such proclamation or ordinance is to be liberally construed in behalf of the claimants, there must be found therein sufficient language to justify the court in finding that the intention was to exempt from seizure the class of property under investigation. The language, to justify an exemption, must be found. It cannot be presumed from international history or policy, nor from the principles of justice, generosity, or humanity.

The important questions in the cases now pending arise upon the construction of the proclamation of the president of the United States of April 26, 1898. As that is construed by the claimants of these several steamships, each one of them comes within some provision of this proclamation which exempts it from the liability of capture and condemnation, but, as construed by the attorneys for the captors, not one of them is so exempt. The proclamation is as follows:

"By the President of the United States of America.

"A Proclamation.

"Whereas, by an act of congress approved April 25th, 1898, it is declared that war exists, and that war has existed since the 21st of April, 1898, including said day, between the United States of America and the kingdom of Spain; and whereas, it being desirable that such war should be conducted upon principles in harmony with the present views of nations, and sanctioned by their recent practices, it has already been announced that the policy of this government will be not to resort to privateering, but to adhere to the rules of the Declaration of Paris:

"Now, therefore, I, William McKinley, president of the United States of America, by virtue of the power vested in me by the constitution and the laws, do hereby declare and proclaim:

"(1) The neutral flag covers enemy's goods, with the exception of contraband of war.

"(2) Neutral goods, not contraband of war, are not liable to confiscation under the enemy's flag.

"(3) Blockades, in order to be binding, must be effective.

"(4) Spanish merchant vessels in any ports or places within the United States shall be allowed until May 21st, 1898, inclusive, for loading their cargoes and departing from such ports or places; and such Spanish merchant vessels, if met at sea by any United States ship, shall be permitted to continue their voyage, if, upon examination of their papers, it shall appear that their cargoes were taken on board before the expiration of the above term: provided, that nothing herein contained shall apply to Spanish vessels having on board any officer in the military or naval service of the enemy, or any coal (except such as may be necessary for their voyage), or any other article prohibited or contraband of war, or any despatch of or to the Spanish government.

"(5) Any Spanish merchant vessel which, prior to April 21st, 1898, shall have sailed from any foreign port bound for any port or place in the United States, shall be permitted to enter such port or place, and to discharge her cargo, and afterward forthwith to depart without molestation; and any such vessel, if met at sea by any United States ship, shall be permitted to continue her voyage to any port not blockaded.

"(6) The right of search is to be exercised with strict regard for the rights of neutrals, and the voyages of mail steamers are not to be interfered with, except on the clearest grounds of suspicion of a violation of law in respect of contraband or blockade.

"In witness whereof, I have hereunto set my hand and caused the seal of the United States to be affixed.

"Done at the city of Washington the 26th day of April, in the year of our Lord one thousand eight hundred and ninety-eight, and of the independence of the United States the one hundred and twenty-second.

"[Seal.]                                      Wm. McKinley.
"By the President:
"Alvey A. Adee, Acting Secretary of State."

Examining this proclamation in its several parts, we find: First, the simple declaration and announcement of a recognition of a condition of war existing since the 21st of April, 1898, as declared by the act of congress of April 25, 1898; second, a declaration of the desire that such war shall be conducted upon principles in harmony with the present views of nations, and sanctioned by recent practice. This being the declared intention of the executive, it must be accepted to aid in construing the subsequent declarations of the proclamation. The first point in which the executive desires to continue the practice and be in harmony with the views of nations is that there shall be no privateering; the second, that a neutral flag shall cover the enemy's goods with the exception of contraband of war, and that neutral goods not contraband of war shall not be liable to forfeiture under the enemy's flag. So far it is very clear that the proclamation has followed the humane practice of all nations more recently established; but, reaching the fourth article of the proclamation, we find it absolutely necessary in these cases, in order to interpret and construe it according to the arguments of either the libelants or the defendants, to read into it some language determining the time at which Spanish merchant vessels should be "in any ports or places within the United States" to give them the right of being allowed until May 21, 1898, for

loading their cargoes and departing. There is no expression of any element of time in this connection to aid in the construction, but upon this depends the cases of the Catalina and of the Miguel Jover, which cleared from New Orleans the evening of April 21, 1898. It is urged by the claimants that the intention of the proclamation was that the exemption should attach to all Spanish merchant vessels in harbor at the outbreak of the war, and that the words "at that date," or their equivalent, should be understood; while the counsel for the captors contend that there can be no retroactive effect of the proclamation, and the only word that could be understood is "now." Which of these views is in harmony with the present view of nations, and sanctioned by their recent practice? Formerly, at the outbreak of war, nations lost no time in seizing enemies' shipping found in their ports, although they had entered in good faith in time of peace; but modern usage condemns such a breach of national good faith, and recent practice has been to give certain days of grace to shipping found within enemies' ports at the outbreak of war. In the Crimean war of 1854, Russian vessels were allowed six weeks to leave British ports. In 1870, thirty days were allowed German vessels in French ports, and French vessels in German ports were allowed six weeks to leave. In 1897 (the Greco-Turkish war) fifteen days were allowed by each nation for the vessels of the opposite nation to clear with impunity. In each of these cases the immunity attached from the outbreak of the war.

In the proclamation of the 22d of April the president had declared that 30 days of grace should be given to neutral vessels found in blockaded ports. Can it be believed that he intended to change the number of days of grace, from 30, already named in one proclamation, to 25 in this? Is it not more reasonable to consider that the same number of days was intended, which, commencing at the outbreak of the war, would bring it to the 21st of May, the day named?

Was it the intention of this proclamation to apply these days of grace to all vessels in ports of the United States at the outbreak of the war, or to those so in port on the day of the actual issuance of the proclamation? If the latter construction is accepted, it certainly would not be in accordance with the present views of nations, nor sanctioned by their recent acts. It would leave a space of five days after the commencement of hostilities when, according to such views and practice, they might be considered exempt from seizure, and could safely leave port; but upon the issuing of such proclamation became subject to seizure. If they were safe according to the present rule of civilized nations, certainly the issuing of the proclamation at a later day, without declaring that it should be retrospective, should not make them liable. While it is true that the rule of construction generally is that statutes have no retrospective or retroactive effect, it is not without exceptions, and the principal question always is, what was the intention of the legislators? It is contended that, the vessels being captured before the proclamation issued, the rights of the captors attached; but, if it was the intention to exempt all in port at the outbreak of the war, it is not considered that the attaching of any such right should influence the decision in these cases. Giving the

introductory language of the proclamation the force to which I consider it is entitled, I feel compelled to hold that the intention of the executive was to fully recognize the recent practice of civilized nations, and not to sanction or permit the seizure of the vessels of the enemy within the harbors of the United States at the time of the commencement of war, or to permit them to escape from ports to be seized immediately on entering upon the high seas; and that the fourth article should be held to apply to all Spanish merchant vessels in a harbor of the United States upon April 21, 1898, and exempt them from seizure. This will effect the release of the Catalina and the Miguel Jover.

In regard to the cargoes of such vessels, it cannot be considered that it could be the intention of the executive, or the policy of any nation, to permit vessels to take in their cargoes up to a certain time, and leave the port free, and then have them seized, so that the cargoes should be liable to condemnation. What makes the free vessel makes the free cargo, although it may be found to belong to the enemy.

The fifth article of this proclamation declares that any Spanish merchant vessel, which, prior to April 21, 1898, shall have sailed from any foreign port bound to any port or place in the United States, shall be permitted to enter such port and discharge her cargo, and afterwards to depart without molestation. This raises a question which is not without difficulty in the cases against the Pedro and Guido. The testimony shows that both these vessels were owned by a Spanish corporation of Bilboa, Spain, and were engaged in regular trade with outward cargoes from European—particularly Spanish—ports to the Cuban ports to discharge; thence to some part of the United States—usually Pensacola—for a load of lumber for the return voyage. The Guido had sailed from Liverpool by way of Santander, Coruna, and La Puebla, and was bound for Havana. In her regular course, after she had touched at that and several of the Cuban ports, she would have proceeded to Pensacola, and she had among her papers a bill of health for that place; but there was no charter party or certainty of her going there. She had no cargo for that or any other port of the United States. The Pedro, a vessel of the same line, had sailed from Antwerp with cargo destined for several Cuban ports. She had been into Havana, discharged some cargo, and taken other on board, and was bound to Santiago. After she had touched there, and one or two other Cuban ports for which she had cargo, she was under charter to proceed to Pensacola to load lumber for some port in Europe. She had on board no cargo for Pensacola. It is contended by the claimants of these two vessels that the fact that their ultimate destination, after stopping at the other ports, was a port of the United States to take in a cargo, brings them within the provision of the fifth article of the proclamation, as being vessels which, prior to April 21, 1898, had sailed from a foreign port, bound for a port or place of the United States; and extended and elaborate arguments were had, and cases were cited, upon the subject of continuing voyages and their termini. I do not consider that such a construction can be recognized as reasonable when applied to the cir-

cumstances of this case; nor that it can for a moment be considered to have been the intention of the proclamation when made. The reasons for such exemption from seizure are twofold: First, it excuses a vessel which, ignorant of the condition of war, comes directly into the power of the enemy, and is, therefore, to that extent, a protection to commerce, and tends to prevent a breaking up of commercial relations between nations upon the first, and perhaps unfounded, suspicion of unfriendly relations between them; secondly, as the material increase of a nation's possession is always desirable upon the outbreak of war, and the importations of foreign cargoes may well be considered to tend towards such increase, it is desirable to encourage these importations, although brought by ships of the enemy. But neither of these reasons apply to the cases at bar. These vessels would have been informed of the condition of war long before approaching our shores. In fact, a state of war existed before the Pedro left Havana; and, having no cargo to bring into this country, they were only coming to take property away, and in the meantime carrying on commerce in the interest of the enemy between its ports, and supplying it with necessary provisions with impunity.

It is also urged by the claimants of these vessels that, although they were owned by a Spanish corporation of Bilboa, La Flecha, the general managers of which were Spanish citizens, and resided at Barcelona, a large portion of the stock of this corporation was owned by subjects of Great Britain, who had a lien on, or equitable ownership of, the rest of the stock, so that in reality the vessels were neutral property, and had only been put under the Spanish flag to take advantage of certain privileges given them in trading to the Spanish West Indies. It has been repeatedly declared that the property of a house of trade established in an enemy's country is liable to condemnation as prize, whatever may be the domicile of the partners, and this principle will apply with much greater force to the property of a corporation duly incorporated, and acting under the laws of an enemy's country, regardless of the domicile of the individual stockholders, or any equitable interest neutrals might have in the stock. A mortgage or equitable lien upon the vessel itself, if held by a neutral, could not protect her from seizure, and much less can an equitable interest in the stock of the corporation which is the owner. These vessels were owned by a Spanish corporation, sailing under a royal Spanish patent, flying the Spanish flag, officered and manned by Spanish citizens, nearly, if not quite, all of whom were registered as members of the Spanish naval reserve; and they must be taken and considered as in all respects property of the enemy, and subject to forfeiture.

The Panama sailed from New York before the 21st of April, 1898, and was upon the high seas at that time and at the time of capture. The fact that there had been no formal proclamation or declaration of war before she had sailed or at the time she was captured, or that she had at a recent date left a port of the United States, cannot be considered as exempting her from the liability of all enemy's property to capture, unless coming directly within the language of the president's proclamation. The practice of a formal proclamation before

recognizing an existing war and capturing enemy's property has fallen into disuse in modern times, and actual hostilities may determine the date of the commencement of war, although no proclamation may have been issued, no declaration made, or no action of the legislative department of the government had. This date has been declared by the act of congress of April 25, 1898, and by the proclamation of the president of the next day to have been April 21, 1898, including that day, so that any Spanish property afloat, captured from that time, became liable to condemnation, unless exempt by the executive proclamation.

In the case of the Buena Ventura it is shown by the evidence that she cleared for Scranton, Miss., with permission to touch at Newport News for coal on her voyage to Rotterdam. Although she was to touch there for that purpose, it was not a port of discharge, nor was she from a foreign port, and her case clearly does not come within the language of the proclamation. Had she been captured approaching Newport News for the purpose of coaling, even then there might have been some opportunity for argument that the permission to touch had given her encouragement, and it should, in justice, furnish the same protection as to a vessel coming from a foreign port; but that was not the case. When captured she must have been pursuing the same course she would have pursued had there been no intention to stop for coal, and neither such intention nor permission tended in any way to increase the liability of her capture. She was an enemy's vessel, found upon the high seas at the commencement of the war, and not coming within the exceptions of the proclamation. Her cargo was shipped by a citizen of the United States to a neutral port, consigned partly to the shipper's order and partly to a citizen of Great Britain, and is unquestionably either neutral, or the shipper's property. The suggestion that it should be condemned, although neutral, because found in an enemy's vessel, and, at the time of the capture, there had been no proclamation issued declaring it not subject to condemnation, cannot be entertained for a moment. The policy and law declared in the executive proclamation is considered to be the law by which this court is governed, whether the capture took place before or after it was issued. It is the existing law by which rights must be determined, and in this matter there can be no possible question of construction or intention.

The cargoes of the Pedro and the Guido appear from the testimony and papers found on board to have been mostly shipped by neutrals to parties in the enemy's country. Such shipments are prima facie enemies' property, and subject to condemnation; but such presumption can be overcome by evidence, and, in those cases in which claims and test affidavits have been filed tending to show the ownership, time will be given for further proof; but the property all being either perishable, or subject to deterioration by delay, or such that the cost of keeping will be disproportionate to its value, an order of sale will issue, and the claim stand against the proceeds of sale.

The Panama, after touching at Havana, was bound to Vera Cruz, and a large portion of her cargo is shown to have been shipped to Mexico, and consigned to residents, and presumptively citizens, of

that republic. That is all prima facie neutral property, and will be released. The rest, shipped by merchants in New York, and consigned to parties in Havana, is presumably the property of the consignees, but, where claims and test affidavits have been filed combating that presumption, time for further proof will be given, as in the cases of the Pedro and the Guido. When the property can be immediately restored to the claimants, it will be so ordered, but otherwise it will be sold pending further proof, as the greater part, if not all, is liable to deterioration by the delay.